UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                 :

KRYSTAL SHIPPING CO. LTD.          :

                     Plaintiff,    :     No. 07 CV 11596 (JUDGE CHIN)

       - against -           :

                                   :     **VERIFIED**

                                   :     **COMPLAINT**

LION CHARTERING LTD.,         :

                     Defendant.  :

                                   :
------------------------------------------------------------x

      Plaintiff, KRYSTAL SHIPPING CO. LTD., ("Plaintiff") by its attorneys, Hill,

Betts & Nash LLP, as and for its Verified Complaint against Defendant LION

CHARTERING LTD. ("Defendant"), alleges upon information and belief as follows:

      1.      This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a

maritime contract of charter party, and this Court has jurisdiction pursuant to 28 U.S.C.

§1331. Federal jurisdiction also exists because the action arises under the Convention on

the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.*

and/or the Federal Arbitration Act, 9 U.S.C.§1 *et seq.*

      2.      At all times relevant hereto, Plaintiff was and still is a foreign business

entity duly organized and existing under the laws of Denmark with an address at c/o

Clipper Wonsild Tankers Holding A/S, Harbour House, Sundkrogsgade 21, DK-2100

Copenhagen, Denmark.

      3.      At all times relevant hereto, Defendant was and still is a foreign business

duly organized and existing under the laws of a foreign country with an office and place

of business at c/o Fairdeal Group Management S.A., 34, Alex Papanastasiou Avenue, Kastella 185 33 Piraeus, Greece and at 80 Broad Street, Monrovia, Liberia.

4.      On or about February 8, 2007, Plaintiff as "Owner" and Defendant as "Charterer" entered into a maritime contract of voyage charter party (the "Charter") covering the carriage of a part cargo from Haifa, Israel to La Spezia, Italy. A true and complete copy of the Charter is attached as Exhibit 1.

5.      The Charter provides that English law will apply to the Charter and any and all disputes arising out of the Charter shall be submitted to arbitration in London.

6.      Under the Charter, Defendant was required to pay freight to Plaintiff for carriage of the cargo. It was also required to pay demurrage to Plaintiff at a rate of USD 14,000 per day or prorata for all time that loading and discharge exceeded allowed time as specified in the Charter.

7.      The Vessel arrived at the loadport of Haifa and tendered notice of readiness to load on February 21, 2007. The Vessel completed loading and discharging at the discharge port of La Spezia and sailed from that port on March 8, 2007.

8.      Defendant paid freight by remitting funds through a New York bank under the nomination "Lion Chartering Ltd. c/o Fairdeal Group Management." Upon information and belief, Defendant collects funds due to it and disburses funds owed by it through accounts at New York banks held in its own name and in the name of its manager, Fairdeal Group Management S.A.. A true and correct copy of the freight remittance advice from J.P.Morgan Chase to the account designated by Plaintiff in the Charter is annexed hereto as Exhibit 2.

9.      By invoice dated April 3, 2007, Plaintiff's agent Clipper Wonsild Tankers Holding A/S sent an invoice for demurrage to Defendant through brokers in the amount of USD 87,824.48. Attached to the invoice was full documentation in support of the demurrage claim including Notices of Readiness, Laytime Calculation, Time Sheets, Pumping Logs and Letters of Protest. A true and complete copy of the invoice and supporting documentation is attached hereto as Exhibit 3

10.     Defendant has acknowledged receipt of Plaintiff's demurrage claim but has made no payment of this claim to Plaintiff.

11.     This action is brought to obtain jurisdiction over Defendant and to obtain security in favor of Plaintiff in respect to amounts due under the Charter for demurrage in the amount of USD 87,824.48, and for any additional sums to cover Plaintiff's anticipated attorney fees and costs in pursuit of its claims against Defendant which fees and costs are estimated to be USD 25,000.00.

12.     This action is further brought to obtain security for any additional sums to cover interest which is estimated at a rate of 4% from the time payment was due, i.e., April 3, 2007, until the entry of judgment or an arbitration award in one year from the date of filing the complaint which interest is estimated to be USD 8,000.00

13.     Plaintiff estimates, as nearly as can be computed, the total amount of its claim including interest and costs which is sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by Plaintiff against Defendant and in the sum of USD 120,824.48.

14.     Upon information and belief, and after investigation, the Defendant cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of

Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising of, *inter alia,* cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (hereinafter, "ASSETS"), moving in its own name and in its name in care of its managers Fairdeal Group Management S.A. through banking institutions including but not limited to JP Morgan Chase Bank, American Express Bank, Bank of America, Citibank N.A., Deutsche Bank, HSBC, HSBC USA Bank N.A., Standard Chartered Bank, The Bank of New York, Wachovia Bank, and/or other institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

WHEREFORE, KRYSTAL SHIPPING CO., LTD. prays:

a.  That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it;

b.  That since Defendant cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant up to and including the sum of USD120,824.48 may be restrained and attached, including but not limited to any cash, funds, credits wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant including but not limited to such assets as may be held, received or transferred in the name, to wit:  LION CHARTERING LTD. or LION

CHARTERING, or as may be held, received or transferred for its benefit in the name of LION CHARTERING c/o FAIRDEAL GROUP MANAGEMENT S.A. or LION CHARTERING c/o FAIRDEAL GROUP MANAGEMENT at, moving through, or within the possession, custody or control of banking institutions including but not limited to: JPMorgan Chase Bank, American Express Bank, Bank of America, Citibank N.A., Deutsche Bank, HSBC USA Bank N.A., Standard Chartered Bank, The Bank of New York, Wachovia Bank, and/or any other garnishee(s) upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served; and

c. That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and,

d. For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
     December 27, 2007

HILL, BETTS & NASH LLP

By:    _____
        Mary T. Reilly (MR-6305)
        Attorneys for Plaintiff
        *Krystal Shipping Co., Ltd.*
        One World Financial Center
        200 Liberty Street, 26th Floor
        New York, NY 10281
        (212) 839-7000

## ATTORNEY VERIFICATION

STATE OF NEW YORK      )
                       : ss.:
COUNTY OF NEW YORK  )

MARY T. REILLY, being duly sworn, deposes and says as follows:

1.      I am counsel to the firm of Hill, Betts & Nash LLP, attorneys for Plaintiff

in this action, I have read the foregoing Verified Complaint and know the contents

thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are

communications, information and documentation provided by our client.

3.      The reason this verification is made by an attorney and not by the Plaintiff

is because the Plaintiff is a foreign entity, none of whose officers are presently within this

Judicial District.

By:      _____
              Mary T. Reilly

Sworn to before me this
· 27 day of December 2007

_____
        Notary Public
        GORDON S. ARNOTT
NOTARY PUBLIC, State of New York
        No. 02AR6114793
     Qualified in New York County
Commission Expires Aug. 23, 2008

# EXHIBIT 1

**Association of Ship Brokers & Agents (U.S.A.), Inc.**

October 1977

**MERIDIAN BROKERAGE INC.**

70 FILCNOS STR . PIRAEUS 18535, GREECE

PHONE 21 04 52 70 00 ● FACSIMILE 21 04 52 00 14 ● TELEX 212000

ORIGINAL

**CODE WORD FOR THIS CHARTER PARTY:**

**ASBATANKVOY**

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

IT IS THIS DAY AGREED between *KRYSTAL SHIPPING CO. LTD*    Place *PIRAEUS*    Date *08/02/2007*

*BAHAMAS FLAG*

~~chartered owner~~/owner (hereinafter called the "Owner") of the

~~SS/MS~~ *MT CLIPPER KRYSTAL*    (hereinafter called the "Vessel")

and *LION CHARTERING LTD.*    (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble

and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

**PART I**

Built 2006,Imo ii, Port of registration: Bahamas, Loa:116.5m, Beam:20m, Tpc:20.6m.Cubic capacity (98%): 11,594 cbm excl slops, Slop tanks capacity (98%) 666.5 cbm. P&I club : Gard, **Full description as attached at the end of the charter party**

A. Description and Position of Vessel:

Deadweight: *11,262 metric* tons ~~(2240 lbs.)~~    Classed: *ABS*

Loaded draft of Vessel on assigned summer freeboard    *8.4m* ft.    ~~in. in salt water.~~

Capacity for cargo: *12,253 cubic meters* tons ~~(of 2240 lbs. each)~~ *at 98% more or less, Vessel's option Including slops.*

Coated:  ☒Yes *SIGMA PHENGUARD*    ☐No

Coiled:  ☒Yes *STAINLESS STEEL*  ☐No Last ~~two~~ cargoes    *three*    *Mtbe/Benzene/Benzene+Gasoil+C9*

Now:    Expected Ready:

B. Laydays:

Commencing: *16 Feb , 2007 00:01 hrs*    Cancelling: *21 Feb, 2007 24:00 hrs*

C. Loading Port(s):

*One (1) Safe Port-,Berth Haifa*

~~Charterer's Option~~

D. Discharging Port(s):  *One (1) Safe Port-Berth La spezia*

~~Charterer's Option~~

E. Cargo:  *Part cargo minimum 7,500 mts up to 7,700 mts Charterers' option of Jet NDFCAPMQS (S.G 0.8).*
*One (1) grade unl/und/undarker 2.5 npa*

F. Freight ~~Rate:~~  *Usd 27.75 pmt bss 1/1 for min quantity supplied.*
*Any quantity in excess to be paid with 50% Overage.*    ~~per ton (of 2240 lbs. each)~~

G. Freight Payable to:  *Nordea Bank Danmark A/S*
*International Payments*
*P.O.Box 850*
*DK-0900 Copenhagen C. Denmark*
*Swift Code: NDEADKKK*
*Bank Branch no: 2149*
*Account No: 5036095743*
*Iban No: DK82 2000 5036 095 743*
*Beneficiary: Clipper Fourth Ltd.*
*Reference: Clipper Krystal - Com 589 - F000006 - Client 12890*    at



## ORIGINAL

H.  Total Laytime in Running Hours:  *Sixty (60) hours Total, Sundays and Holidays Included*
*Time in La Spezia not to count before feb 24th 18:00 Hrs UU*

I.  Demurrage per Day:  *Usd 14,000 prorata*

J.  Commission of   2.5add   % is payable by Owner to   *Plus 2.5% to Meridian Brokerage Inc Plus 2.5% to Chemigas on Freight,*
*Dead freight, Demurrage*
~~on the actual amount freight, when and as freight is paid.~~

K.  The place of General Average and arbitration proceedings to be London/New York (strike out one) – *English Law to apply.*

L.  ~~Tovalop;~~ Owner warrants vessel to be a member of ~~TOVALOP~~ scheme and will be so maintained throughout duration of this charter.   | ITOPF |

M.  Special Provisions:

1.  *York / Antwerp Rules 1974, as amended 1990.*
2.  *Freight payable Usdollars to owners designated bank account by T/T As per Asbatank voy*
3.  *Maximum three (3) hours awaiting for cargo documents to be for Owners' account.*
4.  *Owners' agent at load port/Charterers' at discharge provided,competitve*

*Major's approvals:*
*To the best of Owners knowledge at the time of fixing without guarantee the vessel is approved by:Repsol,Cepsa and is*
*CDI inspected*

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of:

By: _____

Witness the signature of:

By: _____

For: as per authority
Clipper Wonsild Tankers Holding A/S
KRYSTAL SHIPPING CO LTD
as agents only

LION CHARTERING LTD.
LION CHARTERING LTD.
LIBERIA

ORIGINAL.

# PART II

1    WARRANTY-VOYAGE-CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and be seaworthy, and having all pumps, pumps and heater coils in working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owners and/or Master's control excepted, shall load (always afloat) from the factors of the Charterers a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested

2    FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3    DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4    NAMING LOADING AND DISCHARGE PORTS.

    (a)    The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

| | On a voyage to a port or ports in: |
|---|---|
| ST KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf Loading port(s) |
| | (from ports west of Port Said) |

    (b)    If lawful and consistent with Part I and the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LANDS END | United Kingdom/Continent (Bordeaux/Hamburg range) |
| | or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTER | Mediterranean (from Western Hemisphere). |

    (c)    Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5    LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date, otherwise this Charter to remain in full force and effect.

6    NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs, However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime or demurrage.

7    HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharging ballast water or stops, will not count as used laytime or demurrage.

8    DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots. See also Special Provision No. 3

9    SAFE BERTHING-SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise in Clause 15

10    PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11    HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses

12.    DUES-TAXES-WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis or quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13    (a) CARGOES EXCLUDING VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F) in excess of thirteen and one-half pounds (13.5 lbs) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading of topping off from Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist

14    (a) ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

# ORIGINAL

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14(a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

    (a)    Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

    (b)    All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

    (c)    Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

    (d)    Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charterer is to consist only of liquid bulk cargo as specified in Clause I.

17 (a) QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18 CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19 GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from: -any act, neglect, default or barratry of the Master, pilots, mariners, or other servants of the Owner in the navigation or management of the Vessel, fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from: -Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20 ISSUANCE AND TERMS OF BILLS OF LADING

(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

    (i)    CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods By Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

    (ii)    JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery



    (iii)    GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared

    (iv)    BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship to the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact

    (v)    LIMITATION OF LIABILITY Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

    (vi)    WAR RISKS (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge-the Charterers shall have the right to order the cargo or such part of it as may be effected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (wether within the range of

# ORIGINAL

discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(e) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii)       DEVIATION CLAUSE.   The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21    LIEN    The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22    AGENTS.  The Owner shall appoint Vessel's agents at all ports.

23    BREACH.  Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24    ARBITRATION.  Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of ~~New York or in the City of London~~ whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party.  In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators.  Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination.  Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25    SUBLET.  Charterer shall have the right to sublet the Vessel.  However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26    OIL POLLUION CLAUSE.  Owner agrees to participate in Charterer's program covering oil pollution avoidance.  Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled. Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place.  All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange.  If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred. Should it be determined that the residue is to be co-comingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjuction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

Disclaimer:
This Charter Party is a computer generated copy of ASBATANKVOY form, using software which is the copyright of Meridian Brokerage Inc. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author. The Author, Licensee and the End User assume no responsibility for any loss or damage caused as a result of discrepancies and/or typographical error(s) between the original ASBATANKVOY form and this computer generated copy.



# ORIGINAL

BILL OF LADING

Shipped in apparent good order and condition by _____

                            Steamship
on board the _____ Motorship _____

whereof_____ is Master, at the port of _____

_____

_____

_____

_____

_____

_____

to be delivered at the port of _____

or so near thereto as the Vessel can safely get, always afloat, unto _____

_____

or order on payment of freight at the rate of _____

                                   contract
This shipment is carried under and pursuant to the terms of the charter dated New York/London_____

Between_____ and _____
                                 contract

Charterer, and all the terms whatsoever of the said charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

    In witness whereof the Master has signed_____Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void

    Dated at_____this_____day of_____

                                 _____
                                     Master



ORIGINAL

MERIDIAN BROKERAGE INC.

M/T 'CLIPPER KRYSTAL ' / Charter Party Dated  8th February, 2007

## LION CHARTERING LTD's ADDITIONAL TERMS

### GENERAL TERMS  - (Amended 15-06-2006)

A. ASBATANKVOY to apply, with following amendments / additions :

Part I
Item K : **Delete New York**
Item L : **Delete and insert Owners warrant that throughout the duration of this charter, vessel will be owned/demise owned by a member of ITOPF**

Part II
Clause 2        *FREIGHT*
- ~~Lines 2 & 3 : Delete 'Inspector's Certificate of Inspection' - Insert "Bill of Lading"~~

Clause 5        *LAYDAYS*
- Line 1 : Insert **"06.00 hrs (local time) on"** - after 'before'.
- ~~At the end : Insert "Cancellation, or failure to cancel, shall be without prejudice to any claim for damages charterers may have against the owner" and "See Clause 19"~~

Clause 6        *NOTICE OF READINESS*
- ~~Last sentence after 'However..." insert "irrespective of whether the berth is reachable on arrival or not"~~
- Add at the end **"or demurrage even if vessel is on demurrage"**
- Add at the end **"In any event, charterer shall be entitled to 6hrs NOR at loading and discharging ports even if the vessel is on demurrage.**

Clause 7        *HOURS FOR LOADING AND DISCHARGING*
- Line 3, after owner, insert **"military authorities"** and 'after prohibit', insert **"berthing,"**
- Lines 3 & 6 after 'used laytime' and at the end of the clause, add **"or demurrage even if vessel is on demurrage**
- Last line after 'ballast water' insert **"(unless same done simultaneously with cargo operation)"**

Clause 8        *DEMURRAGE*
- ~~At end of clause add "or awaiting tide and/or daylight (where night berthing/unberthing is not permitted by the authorities). Also see Rider clause 15"~~

Clause 20/Biii        *ISSUANCE AND TERMS OF* BILLS OF LADING AND *GENERAL AVERAGE*
- Amend '1950' to **"1974 as amended 1990 / 1994"**.
- Delete **"New York"** & **"United States"**

Clause 22        *AGENTS*
- After 'vessel's agents' insert **"Owners`agents load port / Charterers`at discharge port, provided competitive"**

Clause 24        *LITIGATION*
- Add **"See Rider Clause xx"**



.../..2

ORIGINAL

MERIDIAN BROKERAGE INC.

M/T 'Clipper Krystal' / Charter Party Dated 8th February, 2007

B. FREIGHT PAYABLE TO OWNERS IN U.S. DOLLARS. **In case of a Lumpsum freight and vessel is unable to lift the agreed minimum cargo quantity, then freight to be deducted accordingly on a pro rata basis. Where a lumpsum rate has been agreed, same is fully inclusive of all dues & charges, whether levied upon the vessel, freight or cargo.**

D. 50PCT OVERAGE RATE FOR TONNAGE LOADED IN EXCESS OF MINIMUM AGREED QUANTITY

E. 2.5 PCT ADDRESS COMMISSION WHICH CHARTERERS ENTITLED TO DEDUCT FROM FREIGHT/DEADFREIGHT/DEMURRAGE

.../..3



ORIGINAL

MERIDIAN BROKERAGE INC.

M/T 'Clipper Krystal' / Charter Party Dated 8th February, 2007

## LION CHARTERING LTD's RIDER CLAUSES:

### 01. ETA NOTICES AND COMPLIANCE WITH VOYAGE ORDERS

Master to give 5/3/2/1 days (when applicable) direct notices of ETA loading and discharging ports to agents, charterers and any other party as instructed by charterers. Any change in ETA exceeding ~~3 (three)~~ **12 (twelve)** hours to be immediately advised to all the parties receiving notices. Any time lost as a result of Master's failure to comply with the notice instructions shall not count as used laytime or time on demurrage. Owners are responsible for master's / vessel's non-compliance with voyage orders given under this charter; any time lost due to a failure to comply with same, will not be for Charterers' account. If terminal's instructions contradict charterers' orders, Master to stop operations and contact Charterers immediately for clarification.

### 02. ELIGIBILITY

Owners warrant vessel is in all respects eligible for trading within the ports, places and ranges specified in the charter party and that throughout the period of this charter party, she shall be in compliance with all applicable laws and regulations and shall have on board all valid certificates, records and other documents required for such service. Any time lost by reason of failure to comply with such a requirement, shall not count as used laytime or time on demurrage and owner shall indemnify charterers for any damages or expenses which may be incurred as a result of such a breach. ~~Time used for compulsory inspection by Romanian authorities will not count as used laytime or time on demurrage.~~

### 03. OIL POLLUTION INSURANCE / P & I CLUB

Owners warrant that the vessel fully complies with all international safety and pollution regulations and that they have and will maintain throughout the period of this charter the standard oil pollution insurance cover and any additional coverage, which becomes available via their P & I Club or through underwriters providing first class security. Owners warrant the vessel is entered with a first class P + I Club, and will remain so throughout the duration of this charter party.

### 04. CLEAN BALLAST

Vessel to arrive at load port with clean ballast.

### 05. PUMPING

Owners warrant vessel is capable of discharging her entire cargo within 24 hours or maintaining 100 psi at ship's manifold during the entire period of discharge provided shore facilities permit. If shore facilities do not permit, Master keep pumping logs and to issue relevant LOP(s) to the receivers/shore installation and do best to have both countersigned by the terminal. ~~At Taranto Marina Militare where discharge via 1 x 6" hose, vessel to maintain min 325 tphr disch rate provided shore facilities permit.~~

### 06. CARGO RETENTION

If any cargo which is liquid, pumpable and reachable by vessel's fixed pumps, remains on board upon completion of discharge, Charterers have the right to claim an amount equal to the FOB port of loading value of such cargo plus freight; quantity to be determined by an independent inspector.

…/..4



ORIGINAL

MERIDIAN BROKERAGE INC.

M/T 'Clipper Krystal' / Charter Party Dated 8th February, 2007

## 07. DRUGS AND ALCOHOL POLICY

Owners warrant that they have a policy on drugs and alcohol abuse applicable to the vessel which meets or exceeds the standards in OCIMF guidelines for the control of drug and alcohol on board ship (OCIMF January 1990). Owners further warrant that such policy will remain in effect during the terms of this charter, and that owners shall exercise due diligence to ensure that the policy is complied with.

## 08. PORT DUES

Owners to pay for all port expenses, including but not limited to Custom's overtime, wharfage, dockage, quay dues and similar charges imposed by loading/discharging terminals, whether such charges/dues are assessed on the cargo quantity or not.

## 09. NOR

Vessel to tender NOR prior commencement of laydays only with charterers' permission, in which case all time saved from berthing and until 06.00 hrs of the first day of laydays to be credited to charterers against laytime and/or time on demurrage.

## 10. CLEAN BILLS OF LADING

Owners/Master agree to issue and sign original Bills of Lading as presented by the shippers and Master not to add any remarks, **once same Bills of Lading agreed by the Owners.**

## 11. EXTRA INSURANCE

Any extra insurance on cargo due to vessel's flag, class and/or age, to be for owners' account.

## 12. LIGHTERAGE

~~Charterers are to have the option to discharge by lighterage (STS) at any designated port, safe place, or safe anchorage and time consumed performing this operation shall count as laytime or time on demurrage. Time shall commence 6 (six) hours after anchoring or whenever the lightering/STS craft is all secured alongside, whichever occurs first. The anchorage, STS or lighterage area shall not be considered as an additional port or berth and any running time from such lighterage area to berth, shall not count as laytime or time on demurrage.~~

## 13. LETTER OF INDEMNITY

Charterers are permitted to discharge against a faxed or telexed Letter of Indemnity (LOI) without bank guarantee, in case of non-presentation of original Bills of Lading and/or change of destination. Such LOI is to be issued in accordance with the wording of Owners' P & I Club , but without any bank guarantee, ~~and to be cancelled against presentation of 1/3 duly accomplished original Bill of Lading or 13 months from B/L date, whichever is earlier.~~

## 14. LAW and LITIGATION

The laws of England are to apply to this Charter Party. Any amounts arising from this charter which exceed US$50,000 will be subject to the jurisdiction of the English High Court, whereas amounts up to and including US$50,000 to be settled by a single arbitrator in London according to LMAA's small claims procedure.

## 15. WEATHER

Any delays in berthing for loading and/or discharging and any delays after berthing which are due directly ~~or indirectly~~ to weather conditions and/or sea state are to count as 50% of laytime or time on demurrage.

.../..5

MERIDIAN BROKERAGE INC.

M/T 'Clipper Krystal' / Charter Party Dated 8th February, 2007

## 16. CLEANING

Owners warrant that vessel will be presented with tanks, lines and pumps cleaned, dried and in all ways suitable to load charterers' cargo, according to the satisfaction of charterers' independent inspectors. If cargo tanks, lines and/or pumps are not accepted at first inspection, vessel to continue cleaning at owners' time and expense. If after such additional cleaning, or after 24 hours from first rejection, cargo tanks, lines and pumps are still not acceptable for loading, charterers to have the option to cancel this charter party or to order the vessel to carry out additional cleanings at owners' time and expense.

## 17. SAMPLING

~~Charterers are entitled to request vessel to call at or off any port/place en route for cargo sampling purposes. Any time used and/or deviation time, shall count as laytime, or if the vessel is on demurrage, as demurrage. Charterers shall pay owners for additional bunkers consumed during the period of deviation at the replacement price by owners and substantiated by copies of such documents as charterers may require, and shall pay port expenses incurred by owners at the port to which owners were required to divert the vessel.~~

CWT ~~Master/Chief Mate to take on board samples sealed by cargo surveyor for delivery to charterers c/o cargo receivers against signed receipt.~~

## 18. TIME BAR

Any claims and/or invoices received more than 90 days after date of bill of lading will be time-barred and considered null & void. Owners to support any claims for demurrage and/or detention with full documentation i.e. signed statement of facts, NOR, pumping logs, letters of protest etc and deadfreight claims to be supported with a deadfreight statement showing vessel's weight and cubic capacity and letter(s) of protest etc.

## 19. CANCELLATION CLAUSE

~~Following wording to be added to Clause 5 of Asbatankvoy Part II :~~

~~"If it appears that the vessel will be delayed beyond the cancelling date, Owners shall, as soon as they are in a position to state with reasonable certainty the day on which the vessel should be ready, give notice thereof to Charterers asking whether Charterers will exercise their option of cancelling; that option must then be declared within 48 (forty eight) hours of Charterers' receipt of such notice. If the Charterers do not exercise their option of cancelling, the 5th (fifth) day after the readiness date in such Owners' notice shall be regarded as a new cancelling date for the purpose of this Clause.~~

## 20. DIRECT SAILING

Notwithstanding Clause 1 of Part II of Asbatankvoy, upon completion of loading vessel is always to proceed at maximum safe speed, directly to charterers' nominated discharge port(s) ~~with the exception of any deviation for sampling which may be required if Rider Clause 17 is applied.~~

## 21. IN-TRANSIT LOSS

Owners will be responsible for the full amount of any in-transit loss if same exceeds ~~0.25%,~~ 0.5% and charterers shall have the right to claim, an amount equal to the FOB port of loading value of such cargo plus freight & insurance due with respect thereto. In-transit loss is defined as the difference between net vessel's volume after loading port and before unloading at the discharge port. Pumpable cargo shall not constitute an actual loss.



ORIGINAL

MERIDIAN BROKERAGE INC.

M/T ´Clipper Krystal´ / Charter Party Dated 8th February, 2007

## 22. ISM / ISPS COMPLIANCE

Owners warrant that vessel is certified in accordance with the ISM & ISPS codes, and that they hold valid certification.

## 23. ADMINISTRATION CLAUSE

The fixture recap shall be agreed and accepted fully by both parties; it shall be considered as a full and legally binding charter party.

## 24. P &C

The terms of this contract are to be kept strictly private and confidential by all parties involved.

## 25. DOCUMENTATION

Cargo documents : Maximum 3 hrs delay for Owner's account awaiting delivery of the cargo documents on board, after the hoses have been disconnected.

…/..7



ORIGINAL

MERIDIAN BROKERAGE INC.

M/T 'Clipper Krystal' / Charter Party Dated 8th February, 2007

# CWT PROTECTIVE CLAUSES DEC 2005.

Any taxes/dues on cargo for Charterers account and any taxes/dues on vessel/freight to be for Owners account.

~~Owners option / rotation / completion / segregation.~~

~~BL's carried onboard only against BL's marked with foll. Wording 'One original bill of lading retained on board against which bill delivery of cargo may properly be made on instructions received from shippers or charterers.'~~ **As no original Bills of Lading will be placed onboard and cargo to be discharged against Charterers LOI.**

Clean onboard bl/s. Clean in this context is only for letter of credit purposes and does not refer to the quality/physical state of the commodity.

~~Owners agents bends.~~
New Both to Blame Collision Clause
~~Usa Clause Paramount~~
New Jason Clause

Ga/Arb London, eng law, LMAA rules to apply. YA rules 1994.

## BIMCO ISPS Clause for Voyage Charter Parties

(A) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

…/..8

MERIDIAN BROKERAGE INC.        ORIGINAL

M/T 'Clipper Krystal' / Charter Party Dated 8th February, 2007

Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(D) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## AMS Clause

(a) If loading cargo destined for the US, loading cargo from the US or passing through US ports in transit, the Charterers shall:

(i) Latest 48 hours before ETA first US port for discharge or transit, or if loading latest 48 hours before ETD from the US, provide all necessary

information to the Owners and/or their agents to enable them to submit a timely and accurate cargo declaration directly to the US Customs; or
(ii) If permitted by US Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto, submit a cargo declaration directly to the US Customs and provide the Owners with a copy thereof.

iii) Should there be any change in the destination, cargo description or any other infomation initially submittet, the Charterers are promptly to advise all changes, enabling filing of corrected manifest information. Expenses for 2nd and subsequent corrections to the cargo declaration will be filed at Charterers expense.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with the provisions of sub-clause (a), including any delay to the vessel enforced by the US Customs due to late change of destination or other manifest details.

(c) If the Vessel or any cargo is detained, attached, seized or arrested as a result of the Charterers' failure to comply with the provisions of sub-clause (a), the Charterers shall provide a bond or other security to ensure the prompt release of the Vessel and/or cargo.

.../..9

ORIGINAL

MERIDIAN BROKERAGE INC.

M/T 'Clipper Krystal' / Charter Party Dated 8th February, 2007

## BIMCO War Risk Clause for Voyage Charters
## (Code Name: VOYWAR 2004)

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:
War; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(c) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

…/..10

MERIDIAN BROKERAGE INC.    CRIGINAL

M/T 'Clipper Krystal' / Charter Party Dated  8th February, 2007

(d) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(e) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.
(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, or in order to fulfil the Owners' obligation under this Charter Party, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners within 14 days after receipt of the Owners' invoice. If the Vessel discharges all of her cargo within an area subject to additional premiums as herein set forth, the Charterer shall reimburse the Owners for the actual additional premiums paid which may accrue from completion of discharge until the Vessel leaves such area or areas referred to above. The Owners shall leave the area as soon as possible after completion of discharge.

(f) The Vessel shall have liberty:-
(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;
(ii) to comply with the orders, directions or recommendations of any war
risks underwriters who have the authority to give the same under the terms of the war risks insurance;
(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;
(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;
(vi) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

.../.11



MERIDIAN BROKERAGE INC.               ORIGINAL

M/T 'Clipper Krystal' / Charter Party Dated 8th February, 2007

(g) If in compliance with any of the provisions of sub-clauses (b) to (f) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

## Additional War Risk premium

(1) (a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners upon presentation of invoice.

(2) If the Owners become liable to pay to the crew any bonus or additional wages in respect of sailing into or being in an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers upon presentation of invoice.

Additional War Risk on H+M insured value only, if any, to be for Charterers' account, and to be reimbursed against presentation of Owners' invoice to be supported with relevant documentation (including a copy of underwriters invoice). Such amount to be pro-rated with the Charterers of inbound cargo (if any) or with other part/cargo loaders (if any) out of same area covered by the A.W.R. premium.

For:
KRYSTAL SHIPPING CO. LTD
as per authority

Clipper Wonsild Tankers Holding
A/S

as agents only

LION CHARTERING Ltd.
LIBERIA

**The Owners**                                    **The Charterers**



# ORIGINAL

**INTERTANKO'S STANDARD TANKER VOYAGE CHARTERING QUESTIONNAIRE 1988 (Version 2)**
*(Metric system to be applied, HVPQ reference specified where applicable)*

| GENERAL INFORMATION | | HVPQ Ref |
|---|---|---|
| Date Updated: | Jan 29, 2007 | |
| Vessel's name | Clipper Krystal | 1.2 |
| IMO number: | 9330020 | 1.3 |
| Vessel's previous name(s): | Not Applicable | 1.4-1.7 |
| Flag: | Bahamas | 1.8 |
| Port of Registry: | NASSAU | 1.9 |
| Call sign: | C 6 V S 7 | 1.11 |
| Inmarsat phone number: | 4308 949110 | 1.12 |
| Fax number: | 76 3747 583 | 1.13 |
| Email address: | clipperkrystal.030206@skyfile.com | 1.16 |
| Type of vessel | Chemical | 1.17 |
| Type of hull: | Double Hull | 1.19 |

| OWNERSHIP & OPERATION | | |
|---|---|---|
| Registered owner - Full Style: | Krystal Shipping Co. Ltd | 1.20 |
| Technical operator - Full Style: | Clipper Marine Services A/S | 1.22 |
| Commercial operator - Full Style: | Clipper Wonsild Tankers | 1.25 |
| Disponent owner / Bareboat charterer - Full Style: | Same as Commercial Operator<br>Same as Commercial Operator<br>As above<br>As above | |
| Number of vessels in disponent owner's fleet | 16 | |

| BUILDER | | |
|---|---|---|
| Where Built : | STX Shipyard, Korea | 1.26 |
| Date Delivered: | Sep 28, 2005 | 1.31 |

| CLASSIFICATION | | |
|---|---|---|
| Vessel's classification society | American Bureau of Shipping | 1.34 |
| Class notation: | +1A1 (E) Oil and Chemical Carrier ESP (IMO TYPE II & III), +AMS, +ACCU, RES, VEC (without vapour processing unit) | 1.35 |
| If Classification society changed, name of previous society? | N/A | 1.36 |
| If Classification society changed, date of change? | Not Applicable | 1.37 |
| Last dry-dock: | Not Applicable | 1.38 |



ORIGINAL

| Last special survey | Not Applicable | **1.41** |
|---|---|---|
| Latest CAP Rating (if applicable) | 0 | **1.44** |
| Last annual survey | Not Applicable | **1.45** |
| Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS)? | No | |

**DIMENSIONS**

| LOA (Length Over All) | 116.5 Metres | **1.49** |
|---|---|---|
| Extreme breadth. | 20 Metres | **1.51** |
| KTM (Keel to Masthead): | 37.2 Metres | **1.54** |
| BCM (Bow to Center Manifold) | 57 Metres | **1.57.1** |
| Lightship parallel body length: | 0 Metres | **1.57.3** |
| Normal ballast parallel body length: | 0 Metres | **1.57.6** |
| Parallel body length at Summer DWT: | 67.56 Metres | **1.57.9** |

**TONNAGES**

| Net Tonnage: | 3266 | **1.59** |
|---|---|---|
| Gross Tonnage: | 7687 | **1.60** |
| Suez Net Tonnage: | 6614 | **1.61** |
| Panama Net Tonnage: | 6507 | **1.62** |

| LOADLINE INFORMATION | Freeboard | Draft | Deadweight | Displacement | |
|---|---|---|---|---|---|
| Summer: | 3.31 Metres | 8.4 Metres | 11420 Metric Tonnes | 15021 Metric Tonnes | **1.63** |
| Winter: | 3.49 Metres | 8.24 Metres | 11057 Metric Tonnes | 14658 Metric Tonnes | **1.64** |
| Tropical: | 3.14 Metres | 8.59 Metres | 11783 Metric Tonnes | 15384 Metric Tonnes | **1.65** |
| Lightship: | 9.34 Metres | 2.37 Metres | 3600 Metric Tonnes | 3600 Metric Tonnes | **1.66** |
| Normal Ballast Condition: | 6.361 Metres | 5.35 Metres | 0 Metric Tonnes | 9041.6 Metric Tonnes | **1.67** |

| TPC on summer draft: | 20.6 Metric Tonnes | **1.70** |
|---|---|---|
| Does vessel have Multiple SDWT? | No | **1.72** |
| If yes what is the maximum assigned Deadweight? | 0 Metric Tonnes | **1.73** |
| Air draft (sea level to top of mast/highest point) in normal SBT condition? | 31.850 Metres | **1.74** |

**RECENT OPERATIONAL HISTORY**

| Has vessel been involved in any collision, grounding or pollution incident the past 12 months, full description | Pollution: No<br>Grounding: No<br>Collision: No | **1.77-1.79** |
|---|---|---|

**CERTIFICATION**

| Owners warrant following certificates to be valid throughout the Charter Party period: | | |
|---|---|---|
| SOLAS Safety Equipment: | Sep 27. 2011 | **2.2** |
| SOLAS Safety Radio: | Sep 27. 2011 | **2.3** |
| SOLAS Safety Construction: | Sep 27. 2011 | **2.4** |
| Load line. | Sep 27. 2011 | **2.5** |

ORIGINAL

| | | |
|---|---|---|
| IOPPC: | Sep 27 2011 | 2.6 |
| Safety Management (ISM): | Apr 03, 2007 | 2.8 |
| USCG COC: | | 2.11 |
| CLC. | Feb 20, 2007 | 2.13 |
| US COFR | | 2.15 |
| Certificate of Fitness (Chemicals): | Feb 27, 2007 | 2.16 |
| Certificate of Fitness (Gas): | | 2.17 |
| Certificate of Class: | Feb 27, 2007 | |
| ISPS ISSC: | Apr 04, 2007 | |

**DOCUMENTATION**

| | | |
|---|---|---|
| Does the vessel have the following documents on board? | | |
| International Safety Guide for Oil Tankers & Terminals (ISGOTT): | Yes | 2.28 |
| OCIMF/ICS Ship to Ship Transfer Guide (Petroleum): | No | 2.31 |
| Is the vessel entered with ITOPF? | Yes | |

**CREW MANAGEMENT**

| | | |
|---|---|---|
| Nationality of Master | PHILIPPINES | |
| Nationality of Officers: | Filipino | 3.1 |
| Nationality of Crew: | Filipino | 3.2 |
| If Officers/Crew employed by a Manning Agency - Full Style: | Officers: Magsaysay Maritime Corporation<br>Crew: Magsaysay Maritime Corporation | 3.1 & 3.2 |
| What is the common working language onboard? | English | 3.1 |
| Do key officers understand English? | Yes | |
| In case of Flag Of Convenience (FOC), is the ITF Special Agreement on board? | Yes | |

**STRUCTURAL CONDITION**

| | | |
|---|---|---|
| Are cargo tanks coated? | Yes | 7.1 |
| If Yes specify type of coating. | Phenolic Epoxy | 7.1.1 |
| If cargo tanks are coated, specify to what extent: | Whole Tank | 7.1.3 |
| Are slop tanks coated? | Yes | |
| If slop tanks are coated, specify to what extent: | Whole Tank | |

**CARGO & BALLAST SYSTEMS**

| | | |
|---|---|---|
| If double hull, is vessel fitted with centreline bulkhead in all cargo tanks (solid or perforated)? | Yes , (Solid ) | 8.2 |
| Groups / Tank Capacities | | 8.3 |
| Total cubic capacity 98% ex slop tank: | 11594 Cu. Metres | 8.4 & 8.6 |
| Slop tank(s) capacity 98% | 666.5 Cu. Metres | 8.5 & 8.7 |
| SBT or CBT? | SBT | |
| If SBT, what percentage of SDWT can vessel maintain with SBT only? | 38.5 % | 8.14.2 |
| If SBT, does vessel meet the requirements of MARPOL Reg 13(2)? | N/A | 8.14.3 |
| Number of natural segregations with double valve. | 6 | 8.15 |

MERIDIAN BROKERAGE INC.



ORIGINAL

**CARGO PUMPS**

| | | |
|---|---|---|
| Number / Capacity / Type. | None. | 8.18-8.25 |

**GAUGING AND SAMPLING**

| | | |
|---|---|---|
| Can tank innage/ullage be read from the CCR? | Yes | 8.48 |
| Can vessel operate under closed conditions in accordance with ISGOTT 7.6.3? | Yes | 8.51 |
| Type of tank gauging system (radar / floating / other) | Radar | 8.51.1 |
| Are high level alarms fitted and operational in cargo tanks? | Yes | 8.54 |

**VAPOUR EMISSION CONTROL AND VENTING**

| | | |
|---|---|---|
| Is a vapour return system fitted? | Yes | 8.66 |
| State what type of venting system is fitted: | P/V Valves | 8.67 |
| Max loading rate per midships connection for homogenous cargo? | 700 Cu. Metres/Hour | 8.79 |

**CARGO MANIFOLDS**

| | | |
|---|---|---|
| Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment'? | N/A | 8.80 |
| What is the number of cargo connections per side? | 7 | 8.83 |
| What is the size of cargo connections? | 300 Millimetres | 8.84 |
| What is the material of the manifold? | SUS 316L Stainless Steel | 8.86 |
| Distance between cargo manifold centres: | 568 Millimetres | 8.93 |
| Distance ships rail to manifold: | 3850 Millimetres | 8.95 |
| Distance main deck to centre of manifold: | 1970 Millimetres | 8.97 |
| Height of manifold connections above the waterline at loaded (Summer Deadweight) condition? | 5.28 Metres | 8.101 |
| Height of manifold connections above the waterline in normal ballast? | 8.85 Metres | 8.102 |
| Is vessel fitted with a stern manifold? | No | 8.104 |
| Number / size reducers: | 2 x 250/200mm (10/8")<br>1 x 250/300mm (10/12")<br>1 x 150/200mm (6/8")<br>8 x 200/200mm (8/8")<br>2 x 300/300mm (12/12") | 8.106-8.110 |

**CARGO HEATING**

| | | |
|---|---|---|
| Type of cargo heating system? | Heating coils | 8.120 |
| Material of heating system? | Stainless Steel | 8.128 |
| Max load temp: | 70.0 °C / 158.0 °F | |
| Max temp maintain | 60 °C / 140 °F | |

**IGS & COW**

| | | |
|---|---|---|
| Is an Inert Gas System (IGS) fitted? | N/A | 9.1 |
| Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen? | Nitrogen (Bottled) | 9.3 |



ORIGINAL

| | | |
|---|---|---|
| Is a Crude Oil Washing (COW) installation fitted? | N/A | 9.17 |

## MOORING ARRANGEMENTS

| | | |
|---|---|---|
| Number / length / diameter of wires | None | 10.2-5 |
| Breaking strength of wires | None | 10.2-5 |
| Number / length / diameter of ropes | On Drums<br>Forecastle: 4 / 200 / 44<br>Poop: 4 / 200 / 44 | 10.11-18 |
| Breaking strength of ropes | 33.9 Metric Tonnes | 10.11-18 |
| Number and brake holding power of winches: | Forecastle: 2 / 27.5<br>Poop: 2 / 27.5 | 10.22-10.25 |

How many closed chocks and/or fairleads of enclosed type are fitted on:

| | | |
|---|---|---|
| | Focsle: | 5 |
| | Main deck fwd: | 6 |
| | Main deck aft: | 6 |
| | Poop: | 5 |

## SINGLE POINT MOORING (SPM) EQUIPMENT

| | | |
|---|---|---|
| Fairlead size: | 0 | 10.48 |
| Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings (SPM)'? | No | 10.60 |
| Is vessel fitted with chain stopper(s)? | No | 10.61 |
| Number: | 0 | 10.61.1 |
| Type: | | 10.61.2 |
| SWL: | 0 Metric Tonnes | 10.61.3 |
| Max diameter chain size: | 0 Millimetres | 10.62 |

## LIFTING EQUIPMENT

| | | |
|---|---|---|
| Derrick(s) - Number / SWL | 0 / 0 Metric Tonnes | 10.75 |
| Crane(s) - Number / SWL. | 1 / 5 Metric Tonnes | 10.76 |

## ENGINE ROOM

| | | |
|---|---|---|
| What type of fuel is used for main propulsion? | HFO | 12.6 |
| What type of fuel is used in the generating plant? | HFO | 12.14 |

## MISCELLANOUS

| | |
|---|---|
| P & I Club name: | GARD |
| Last three cargoes (Last / 2ᵈ Last / 3ʳ Last) | Contact owner for details |
| Last three charterers (Last / 2ᵈ Last / 3ʳᵈ Last) | Contact owner for details. |
| Last three voyages (Last / 2ᵈ Last / 3ʳᵈ Last) | Contact owner for details. |
| Date of last SIRE Inspection | 02-12-2006 - Dunkerque, France |
| Date of last CDI Inspection | 25-01-2007 - Rotterdam |
| Current Oil Major Company Acceptances (TBOOK) | Contact owner for details. |
| Date and place of last Port State Control | Dec 16 2006 / Norfolk, USA |
| Any outstanding deficiencies as reported by any Port State | No |



ORIGINAL

Control?

If yes, provide details

---

FOR USA CALLS ONLY

| | |
|---|---|
| Qualified individual (QI) - Full Style | QI: Gallagher Marine Systems / David Barry<br>100 Century parkway, Suite 130 Mt. Laurel NJ 08054<br>24h Alt Phone: +1 703 683 4700 |
| Oil Spill Response Organization (OSRO) -Full Style | National Response Corporation<br>3500 Sunrise Highway Suite T103 Great River, NY 11739<br>24h Alt Phone: +1 631 224 9141 |
| Has owner, manager, or operator signed the Sea Carrier Initiative agreement with US customs concerning drug smuggling? | Yes (BIMCO - USCG) |

Revised: July 2004 (INTERTANKO.com / Q88.com)



# EXHIBIT 2



**CLIPPER**

Lion Chartering Ltd.

80 Brad Street
Monrovia
Liberia

**Clipper Wonsild Tankers Holding A/S**

Harbour House
Sundkrogsgade 21
DK-2100 Copenhagen
Denmark
Phone: + 45 4911 8400
Fax:    + 45 4911 8401
www.clipper-wonsild.com

Date    3 April 2007
Inv no   SI00020

## Invoice

**m.t. Clipper Krystal - C/P 8 February 2007**
Loading port: HAIFA - Discharging port: LA SPEZIA
B/L date 25-02-07

|  | USD |
|---|---|
| Demurrage | 90.076,39 |
| Commission:<br>2,5 % on freight, demurrage | (2.251,91) |
| **Balance in Owners favour** | **87.824,48** |

E.& O.E.

We ask you kindly to transfer above balance with value 3 April 2007 to:

Nordea Bank Danmark A/S
International Payments
P.O. Box 850
DK-0900 Copenhagen C.
Denmark
Swift Code: NDEADKKK
Bank Branch No: 2149
Account No: 5036095743
Iban No: DK82 2000 5036 095 743
Beneficiary: Clipper Fourth Ltd.
Reference: Clipper Krystal - Com 589 - F000006 - Client 12890


Yours faithfully
Clipper Wonsild Tankers Holding A/S
(as agents only)

ASGER MARIEGAARD

# LAYTIME CALCULATION

| | | | | | | |
|---|---|---|---|---|---|---|
| **Vessel** | **Clipper Krystal** | | | | **Voyage No** | **8** |
| **Charterer** | **LION Chartering Ltd.** | | | | **C/P Date** | **08-02-07** |
| **Cargo** | **Jetfuel** | | | | **Fixture** | **F000006** |
| **LAYCAN** | **16-02-07 to 21-02-07** | | | | | |

| | Count | Date | Time | % | Time used | |
|---|---|---|---|---|---|---|
| **LOADING HAIFA** | | | | | | |
| End of seapassage | | | | 100,00 | | |
| NOR tendered | | 21-02-07 | 13:58 | 100,00 | | |
| All fast | | 21-02-07 | 17:00 | 100,00 | | |
| Laytime commences | Start | 21-02-07 | 23:00 | 100,00 | | |
| Hoses connected | | 24-02-07 | 11:36 | 100,00 | | |
| Loading commenced | | 24-02-07 | 12:00 | 100,00 | | |
| Loading completed | | 25-02-07 | 9:02 | 100,00 | | |
| Hoses disconnected | End | 25-02-07 | 10:30 | 100,00 | 83 hrs 30 min | |
| Documents onboard | | | | 100,00 | | |
| Sailed | | | | 100,00 | | |
| **TOTAL LOADING HAIFA** | | | | | 83 hrs 30 min | |
| | | | | | | |
| **DISCHARGING LA SPEZIA** | | | | | | |
| End of seapassage | | 02-03-07 | 17:00 | 100,00 | | |
| NOR tendered | | 02-03-07 | 18:45 | 100,00 | | |
| Anchored | | 02-03-07 | 18:45 | 100,00 | | |
| Laytime commences | Start | 03-03-07 | 0:45 | 100,00 | | |
| Anchor aweigh | End | 07-03-07 | 6:22 | 100,00 | 101 hrs 37 min | |
| All fast | Start | 07-03-07 | 8:12 | 100,00 | | |
| Hoses connected | | 07-03-07 | 10:10 | 100,00 | | |
| Discharge commenced | | 07-03-07 | 18:00 | 100,00 | | |
| Discharge completed | | 08-03-07 | 11:40 | 100,00 | | |
| Hoses disconnected | End | 08-03-07 | 13:30 | 100,00 | 29 hrs 18 min | |
| Documents onboard | | | | 100,00 | | |
| Sailed | | | | 100,00 | | |
| **TOTAL DISCHARGING LA SPEZIA** | | | | - | 130 hrs 55 min | |

| | | | % | | |
|---|---|---|---|---|---|
| **Total Time Used** | | | **214 hrs 25 min** | **12865 min** | |
| **Less Time Allowed** | | | **60 hrs 00 min** | **3600 min** | |
| **On Demurrage** | | | **154 hrs 25 min** | **9.265 min** | |
| | | | | | |
| **At full rate** | **USD** | **14.000,00** | **154 hrs 25 min** | **9.265 min** | |
| | | **Total Amount** | | **USD** | **90.076,39** |



# Notice of Readiness

**CLIPPER WORLD TANKERS**

| Vessel: M.T. Clipper Krystal | Date:21 Feb. 2007 | Voy no: 8 |
|---|---|---|
| Port: Haifa | Terminal: ORL TANKING | |

To: <u>ORL OIL REFINERIES, LTD</u>

Dear Sirs,

Please be advised of the arrival of the above vessel at the Anchorage <u>for Haifa on 20 Feb 2007 at 1358 LMT</u>

The vessel is in every respect ready to commence loading / a cargo of <u>**Jet Fuel JP8**</u>
The vessel is hereby nominating a quantity of 7700 MT

Notice of Readiness to Load tendered 1530 <u>hrs lt,21 Feb.2007</u>
Time to commence in accordance with terms and conditions of the Charter Party Dated 08.02.2007.

Please acknowledge receipt of this notice of readiness by signing and returning duplicate copies herewith.

Yours truly

Capt. Karmald. Djurhuus
Master/agent

Received by:

(printed name and stamp)

Per:     **OIL REFINERIES LTD.**

Date: 24 / 02 / 07    Hour: 1140

**AS PER CHARTER PARTY**

**CLIPPER G**

**Time Sheet**

CLIPPER WORSILD TANKERS

| | | Date: | 25-Feb-07 |
|---|---|---|---|
| **VESSEL:** | *Clipper Krystal* | | |
| | Haifa,Israel | **Voy No.** | 8 |
| **Port:** | Oil Dock | | |
| **Terminal:** | | | |
| **Product Name:** | Jet Fuel J8 | | |
| **Ships tank no.** | 1w,2w,4w,5w | | |
| End of sea passage | 1755h/16-Feb-07  Voy 7 | | |
| NOR tendered | 1530h/21-Feb-07 | | |
| Started heaving -up anchor | 1535h/21-Feb-07 | | |
| Anchor up ;Proceeded to pilot station | 1602h/21-Feb-07 | | |
| Pilot on board for Berthing | 1625h/21-Feb-07 | | |
| Passing abeam Haifa Brk.Wtr. | 1630h/21-Feb-07 | | |
| First line ashore | 1648h/21-Feb-07 | | |
| All fast portside at Oil Dock | 1700h/21-Feb-07 | | |
| Gangway down;Surveyor on board. | 1715h/21-Feb-07 | | |
| Tank inspection by attending surveyor | 1715h-1750/21-Feb-07 | | |
| COT 1w,2w,4w,5w accepted for loading a cargo of Jet Fuel | 1750h/21-Feb-07 | | |
| Received message from the Agent that Loading arm to disconnect and proceed to anchorage and await instruction from shipper prior for berthing again | 1030h/22-Feb-07 | | |
| Loading arm disconnected | 1056h/22-Feb-07 | | |
| Pilot on board for unberthing | 1208h/22-Feb-07 | | |
| Started singling-up lines fwd & aft | 1216h/22-Feb-07 | | |
| Left berth Proceeded to anchorage | 1218h/22-Feb-07 | | |
| Pilot off | 1228h/22-Feb-07 | | |
| Anchored at Haifa roads | 1254h/22-Feb-07 | | |
| Received Instructions for berthing from Haifa Port Control ; Pilot at 1000h | 0830h/24-Feb-07 | | |
| Received Instructions for berthing from Haifa Port Control ; Pilot at 1030h | 0904h/24-Feb-07 | | |
| Started heaving -up anchor | 0930h/24-Feb-07 | | |
| Anchor's up | 0955h/24-Feb-07 | | |
| Pilot on board | 1037h/24-Feb-07 | | |
| First line ashore | 1055h/24-Feb-07 | | |
| Pilot off | 1103h/24-Feb-07 | | |
| All fast Stbd.side at Oil Dock | 1106h/24-Feb-07 | | |
| Gangway down;Surveyor on board. | 1120h/24-Feb-07 | | |
| Notice of readiness accepted | as per charter party | | |
| Loading arm connected 1 x 8" to # 4 line | 1136h/24-Feb-07 | | |
| Cargo Tank re-inspected by same surveyor | 1120h-1140h/24-Feb-07 | | |
| Cargo tanks 1w,2w,4w,5w accepted | 1140h/24-Feb-07 | | |

**Delays / Remarks**

1530h/21-Feb-07 to 1200h/24-Feb-07=Ship's ready for loading cargo of Jet fuel J8;due to shore request, Vessel awaiting  Instructions from shipper prior for loading.
0902h-1015h Delay due to excess of loading of cargo ;vessel discharged excess of cargo.

Page1 of 2

OIL REFINERIES LTD.

**FOR RECEIPT ONLY**

**CLIPPER** <span>C</span>                                                  **Time Sheet**

CLIPPER WORLD TANKERS

| VESSEL: | | Clipper Krystal | Date: | 25-Feb-07 |
|---|---|---|---|---|
| Port: | | Haifa, Israel | Voy No. | 8 |
| Terminal: | | Oil Dock | | |
| Product Name: | | Jet Fuel J8 | | |
| Ships tank no. | | 1w,2w,4w,5w | | |
| Continuation : | | | | |
| Loading of First foot cargo 1w,2w,4w,5w | | 1200h-1236h/24-Feb-07 | | |
| Surveyor on board for sampling of first foot cargo in 1w,2w,4w,5w COT | | 1306h/24-Feb-07 | | |
| Cargo samples drawn in 1w,2w,4w,5w COT by attending Surveyor | | 1310h-1330h/24-Feb-07 | | |
| Surveyor off for first foot cargo sample for laboratory test. | | 1330h/24-Feb-07 | | |
| Result of Laboratory test analysis on the first foot cargo passed | | 1500h/24-Feb-07 | | |
| Surveyor on board for adding Cargo addittives in 1w,2w,4w,5w | | 1500h/24-Feb-07 | | |
| Surveyor put additives in 1w,2w,4w,5w (Static Discipitator) | | 1500h-1543h/24-Feb-07 | | |
| Resumed loading cargo in Bulk Jet Fuel J8 | | 1615h/24-Feb-07 | | |
| Started de-ballasting | | 1620h/24-Feb-07 | | |
| Attending surveyor off | | 1650h/24-Feb-07 | | |
| Completed de-ballasting | | 0200h/25-Feb-07 | | |
| Completed loading shore stop | | 0902h/25-Feb-07 | | |
| Loading Arm  Drained to 5w | | 0905h/25-Feb-07 | | |
| Surveyor on board advised ship to discharge 4mt of cargo to shore,to stop by shore | | 0955h/25-Feb-07 | | |
| Discharged excess cargo to shore ,shore stop | | 1010h-1015h/25-Feb-07 | | |
| Loading Arm disconnected | | 1030h/25-Feb-07 | | |
| Sampling of cargo by attending Surveyor in 1w,2w,4w,5w | | 1045h-1130h/25-Feb-07 | | |
| Ullages ,Temperature taken by attending Surveyor | | 1025h-1105h/25-Feb-07 | | |
| Final Analysis of cargo loaded in 1w,2w,4w,5w approved and passed | | 1200h/25-Feb-07 | | |
| Cargo calculation completed | | 1215h/25-Feb-07 | | |
| Cargo Documents on board | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Delays / Remarks

OIL REFINERIES LTD.

Ship FOR RECEIPT ONLY                          Page 2-of 2



# Letter of Protest

**CLIPPER WORLD TANKERS**

| Vessel: MTCLIPPER KRYSTAL | Date: 25 Feb, 2007 | Voy no: 08 |
|---|---|---|
| Port: Haifa, Israel | Terminal: Oildock | |
| Cargo grade: Jet Fuel JP8 | | |

To: <u>ORL OIL REFINERIES LTD, HAIFA</u>

Dear Sirs,

On behalf of our Owners/Charterers, we hereby lodge protest in respect of the following delays from your installation.

Feb. 21, 2007  1530 LT  to  Feb. 24, 2007 1200 LT-

Vessel to pull out by shore request.

Feb. 25, 2007  0902 LT  to  Feb 25, 2007 1015 LT-

Shore request, excess cargo loaded on board, to be

discharged back to shore, all shore stop.

Accordingly, on behalf of our Owners/Charterers, we must hold you responsible for any cost incurred thereby, and reserve the right to refer to this matter at a future date.

Yours faithfully,

OIL REFINERIES LTD.
Shipper

COPTAN **FOR RECEIPT ONLY**

Master

7/1/2000

# Notice of Readiness

**CLIPPER WONSILD TANKERS**

| Vessel:M.T. Clipper Krystal | Date:02 March 2007 | Voy no: 08 |
|---|---|---|
| Port: La Spezia | Terminal: NATO Buoy | |

To: Maxcom Petroli SPA

Dear Sirs,

Please be advised of the arrival of the above vessel at the port of La Spezia  at 1700 LT, 02 March 2007

Anchored at La Spezia anchorage at 1845 LT, 02 March 2007

The vessel is in every respect ready to commence discharging a cargo of  Jet Fuel JP8   B/L 7703.923 MT (vac)

Notice of Readiness tendered  1845 LT 02 March 2007

Time to commence in accordance with terms and conditions of the Charter Party Dated  08th Feb. 2007 .

Please acknowledge receipt of this notice of readiness by signing and returning duplicate copies herewith.

Yours truly

Capt. Antonio R Aaron, Jr
Master

Received by: RICEVUTA A BORDO GIORNO 7.3.07 h.940 AM

**Aeronautica Militare**
**DEPOSITO RETE POL NATO**
**Val Magra - Vezzano Ligure** (printed name and stamp)

Il Responsabile A.M.
M.llo CICCOLA Giovanni

Per: · · · ·

Date:      /    /      Hour:

COPTANKFORM no. 01

7/1/2000

**CLIPPER** 

CLIPPER WONSILD TANKERS

**Time Sheet**

| VESSEL: | | Clipper Krystal | Date: | 08-Mar-07 |
|---|---|---|---|---|
| Port: | | La Spezia, Italy | Voy No. | 8 |
| Terminal: | | Campo Boe Neto | | |
| Product Name: | | Jet Fuel JP8 | | |
| Ships tank no. | | 1w,2w,4w,5w | | |
| Ended Sea passage ;NOR tendered | | 1700h/02-Mar-07 | | |
| Dropped anchor,awaiting for availability of berth,due to occupied. | | 1845h/02-Mar-07 | | |
| Notice of readiness tendered | | 1845h/02-Mar-07 | | |
| Started heaving -up anchor | | 0610h/07-Mar-07 | | |
| Anchor up ;Proceeded to pilot station | | 0622h/07-Mar-07 | | |
| Pilot on board for Berthing | | 0706h/07-Mar-07 | | |
| First line ashore | | 0733h/07-Mar-07 | | |
| All fast | | 0812h/07-Mar-07 | | |
| Gangway down; | | 0815h/07-Mar-07 | | |
| Surveyor, Loading Master,Agent on board | | 0855h/07-Mar-07 | | |
| Ullages,temps.sampling taken wi surveyor water content measured,cargo calculation. | | 0900h-1120h-07-Mar-07 | | |
| NOR accepted | | 0940h/07-Mar-07 | | |
| Cargo hose connected 1x 8" shore hose | | 1010h/07-Mar-07 | | |
| Saybolt Surveyor, Loading Master,off samples drawn in 1w,2w,4w,5w for Lab.test | | 1050h/07-Mar-07 | | |
| Cargo calculation completed | | 1120h/07-Mar-07 | | |
| Lab test analysis result of the samples drawn in cargo tanks 1w,2w,4w, 5w passed | | 1630h/07-Mar-07 | | |
| Commenced unloading cargo Jet Fuel JP8 | | 1800h/07-Mar-07 | | |
| Commenced ballasting | | 1900h/07-Mar-07 | | |
| Completed unloading cargo Jet Fuel JP8 in bulk. | | 1140h/08-Mar-07 | | |
| Cargo tanks Stripping 1w,2w,4w,5w,and all cargo lines were blown/drained to 4w COT | | 1110h-1140h/08-Mar-07 | | |
| Loading Master on board | | 1200h/08-Mar-07 | | |
| Cargo Tanks 1w,2w,4w,5w inspected and accepted as an empty tanks. | | 1210h/08-Mar-07 | | |
| Pumping-in sea water in 4S for pushing cargo on submarine cargo hose shore side | | 1210h-1235h/08-Mar-07 | | |
| Sea water discharged to shore line | | 1245h-1312h/08-Mar-07 | | |
| Agent on board | | 1300h/08-Mar-07 | | |
| Cargo hose disconnected | | 1330h/08-Mar-07 | | |
| Documents on board | | | | |

Delays / Remarks

1630h-1800h/07-Mar-07 =Awaiting shore readiness to commenced discharging.

I.C.S. Genova
Tel. 589261 / 391603
Fax 542754

Shipper / Receiver

Master / Ch. Officer

Il Responsabile A.M.
M.llo NECELLO Giovanni

LA MERCANTILE s.r.l.
genzia Marittima

| Revision Jul-05 | Safety and Quality Management Manual | | | CLIPPER |
|---|---|---|---|---|
| Page 1 of 1 | PUMPING LOG (QA 053-T) | | | |

**Vessel:** Clipper Krystal   **Port:** LA SPEZIA, ITALY   **Voy No:** 8   **Date:** 08-Feb-07

**Berth/Terminal:** CAMPO BOE NATO

| | 1P | 1S | 2P | 2S | 3P | 3S | 4P | 4S | 5P | 5S | Slop P | Slop S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Product | Jet Fuel | Jet Fuel | Jet Fuel | Jet Fuel | | | Jet Fuel | Jet Fuel | Jet Fuel | Jet Fuel | | |
| Density | 0.8005 | 0.8005 | 0.8005 | 0.8005 | → | → | 0.8005 | 0.8005 | 0.8005 | 0.8005 | | |
| Start Time | 1900 | 1900 | 1933 | 1933 | E | E | 1800 | 1800 | 2044 | 2044 | E | E |
| Stop Time | 1933 | 1933 | 2044 | 2044 | M | M | 1900 | 1900 | 2137 | 2137 | M | M |
| Start Time | 2137 | 2137 | 2351 | 2351 | P | P | 0700 | 0700 | 0318 | 0318 | P | P |
| Stop Time | 2351 | 2351 | 0318 | 0318 | T | T | 1140 | 1140 | 0700 | 0700 | T | T |
| Start Time | | | | | Y | Y | | | | | Y | Y |
| Stop Time | | | | | | | | | | | | |
| Total Running Time | | | | | | | | | | | | |
| M³ Total | 695.672 | 702.251 | 1429.704 | 1434.251 | | | 1533.564 | 1626.205 | 1149.443 | 1172.411 | | |
| M³/hr | 545.8 | 545.8 | 545.8 | 545.8 | | | 545.8 | 545.8 | 545.8 | 545.8 | | |
| Ammeter | 220 | 220 | 220 | 220 | | | 220 | 220 | 220 | 220 | | |
| Speed RPM | 200 | 200 | 200 | 200 | | | 200 | 200 | 200 | 200 | | |
| Back Pressure | 5.6kg/cm2 | 5.6kg/cm2 | 5.6kg/cm2 | 5.6kg/cm2 | | | 5.6kg/cm2 | 5.6Kg/cm2 | 5.6Kg/cm2 | 5.6Kg/cm2 | | |

**Comments:**

3/O Nim

2/O J. Arceo

C/O R. Ervas

Il Responsabile A.M.
M.llo UCCIELLO Giovanni

Terminal Representative

# EXHIBIT 3

UMO

| | CORP.PAY<br>Sent by: Ulla Mogensen<br><br>11-12-2007 14:56 | To | Katonia S Douglas/CGM/CLIPPER, |
|---|---|---|---|
| | | cc | |
| | | bcc | |
| | | Subject | Credit advice Clipper Fourth |

Hi Katonia

Could you please mail me a copy of the credit advice regarding ;



Best regards/Venlig hilsen
Ulla
CORP.PAY
--------------------------------------------
Clipper Group A/S
Harbour House
Sundkrogsgade 21
DK-2100 Copenhagen
--------------------------------------------
Phone  : +45 4911 8021/8022/8024
Fax    : +45 4915 0057



**Nordea**

6768

CLIPPER FOURTH LEADER LTD. OG
KARIN SHIPPING CO. LTD M FL
C/O CLIPPER DENMARK A/S
SUNDKROGSGADE 21
2100  KØBENHAVN Ø



**Confirmation**
Payment received

Date 2007.03.13
Account No 5036095743

Reference 7463012952780

### PAYMENT FROM ABROAD

| | | |
|---|---:|---|
| Received amount | 208,355.32 | USD |
| Fees and charges | 5.30 | USD |
| With value 2007.03.14 we have credited account No 2149 5036 095 743 | 208,350.02 | USD |

Beneficiary:
DK8220005036095743
CLIPPER FOURTH LTD

At the request of:
/010017652015
LION CHARTERING LTD
C/O FAIRDEAL GROUP MANAGEMENT
34 ALEX PAPANASTASIOU AVE

Original amount 208,370.32 USD
External charges 15.00 USD

Message to beneficiary:
/RFB/INV CLIPPER KRYSTAL COM 589
F000006 CLIENT 12890

Remitter's bank:
AEGEAN BALTIC BANK S.A.
28, DILIGIANNI STR.
ATHENS - GREECE

**Nordea Bank Denmark A/S**
Shipping,Offshore & Oil Service Div
Strandgade 3, Postboks 850 0900 København C
Tel: Fax: 33 33 66 09
www.nordea.dk
Company registration number 13522197, Copenhagen, Denmark

4372061613
cgapay@c li    pper-group

